Michael Yancey III, NV Bar No. 16158
**CONSUMER ATTORNEYS PLC**
2300 West Sahara Avenue, Suite 800
Las Vegas, Nevada 89102
Phone: (480) 573-9272
Fax: (718) 715-1750
Email: myancey@consumerattorneys.com

*Attorneys for Plaintiff Kevin Kim*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA
SOUTHERN DIVISION**

|  |  |
|---|---|
| KEVIN KIM,<br><br>                    Plaintiff,<br><br>        v.<br><br>CARCO GROUP, INC. d/b/a DRIVER IQ,<br><br>                    Defendant. | **Case No.:**  2:24-cv-01836<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Kevin Kim ("Plaintiff" or "Mr. Kim") by and through his counsel brings the following Complaint against Carco Group, Inc. d/b/a Driver iQ ("Defendant" or "Driver iQ") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of an employment background check report that Defendant published to Plaintiff's potential employer, which falsely portrayed Plaintiff's criminal history.

**INTRODUCTION**

1.    This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

1

2. Defendant is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports generated from its database and furnishes these consumer reports to employers who use the reports to make decisions regarding whether to offer employment to certain consumers.

3. Defendant falsely reported to Plaintiff's prospective employer that Plaintiff was convicted of a 2018 offense for driving under the influence of alcohol and drugs and with more than two dozen pending charges.

4. Defendant's reporting is grossly inaccurate and untrue.

5. Plaintiff's prospective employer withdrew Plaintiff's job offer and terminated his orientation after receiving an employment background check report from Defendant, which included the inaccurate criminal records, which do not belong to Plaintiff.

6. Defendant's inaccurate reporting could have easily been avoided had Defendant reviewed the widely available public court records from Los Angeles County, California regarding the misdemeanor conviction and pending charges prior to publishing Plaintiff's report to his prospective employer.

7. Had Defendant performed even a cursory review of the public court records, it would have discovered that the criminal records belong to a different consumer who is wholly distinguishable from Plaintiff by their date of birth.

8. Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

9. Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking employment by prejudicing their prospective employers with inaccurate criminal record information.

10. Defendant's inaccurate report cost Plaintiff a good paying job and job security.

11. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunity(ies), wages, and

benefits; loss of economic opportunity(ies) and positions and advancements in the future; damage to his reputation; wasted Plaintiff's time and money; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

12. As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA.

**PARTIES**

13. Kevin Kim ("Plaintiff" or "Mr. Kim") is a natural person residing in Las Vegas, Nevada, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

14. Defendant Carco Group, Inc. d/b/a Driver iQ ("Defendant" or "Driver iQ") is a Delaware corporation doing business throughout the United States, including the State of Nevada and in this District, and has a principal place of business located at 5000 Corporate Court, Suite 203, Holtsville, New York 11742, and it can be served with process by way of its registered agent, Corporation Service Company, located at 251 Little Falls Drive, Wilmington, Delaware 19808.

15. Among other things, Defendant sells background checks to employers for their use in deciding whether to offer employment to prospective employees or to take adverse action such as termination, failure to hire, or failure to promote. These reports are provided in connection with a business transaction initiated by the employer.

16. Defendant is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for employment purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

3

**JURISDICTION AND VENUE**

17.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**STATUTORY BACKGROUND**

19.    Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing.  Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

20.    While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports.  15 U.S.C. § 1681.

21.    Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

22.    Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

**THE FCRA'S PROTECTIONS FOR JOB APPLICANTS**

23.    Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates employment background check reports like the one Defendant prepared in Plaintiff's name.

24.    The FCRA provides a number of protections for job applicants who are the subject of background checks for purposes of securing employment, housing, and other purposes.

4

25.     In the parlance of the FCRA, background checks are "consumer reports," and providers of background checks, like Defendant, are "consumer reporting agencies."  15 U.S.C. §§ 1681a(d) and (f).

26.     The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

27.     Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

28.     Defendant disregarded its duties under the FCRA with respect to Plaintiff's background check report.

**DEFENDANT'S ILLEGAL BUSINESS PRACTICES**

29.     Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data.  As a result of the increasing availability of this data, there has been a boom in the background check industry.

30.     As summarized in a recent report by the Consumer Financial Protection Bureau[1], a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening.  CFPB Report at 4.

31.     The criminal background check industry takes in revenues in excess of three billion dollars, annually.

32.     Criminal background checks are generally created by running automated searches through giant databases of aggregated criminal record data.  The reports are created and disseminated with little to no manual, in-person review, and the court records are rarely directly reviewed in creating criminal background checks.

---

[1]  CFPB, Market Snapshot: Background Screening Reports (Oct. 2019), https://files.consumerfinance.gov/f/documents/201909_cfpb_market-snapshot-background-screening_report.pdf  ("CFPB Report").

33.    Background check companies, like Defendant, collect millions of criminal records from a number of sources with data from county, state, and federal level sources. The data included on the reports is often not obtained directly from court records on an individual basis but instead is purchased in bulk or scraped from court websites.

34.    Given that Defendant is in the business of selling background checks, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

35.    Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to Defendant's customers.

36.    Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

37.    Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

38.    Appropriate quality control review of Plaintiff's report would have made clear that Defendant was reporting criminal records that belong to an unrelated consumer who has a different date of birth than Plaintiff.

39.    As a provider of background check reports, Defendant should be aware of the FCRA requirements and is a member of the Professional Background Screening Association ("PBSA"). PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

### FACTS

**Plaintiff Applies for a Job with Schneider National Carriers, Inc.**

40.    On or about August 6, 2024, Plaintiff, along with his wife, applied for full-time employment as truck drivers with Schneider National Carriers, Inc ("Schneider").

6

41.     Plaintiff was particularly interested in the opportunity with Schneider because it would afford him the ability to work as "team drivers" with his wife.

42.     Team drivers are where two individuals drive one truck together, and as a result, they have less hour restrictions and can work over the 11-hour maximum legal driving time of a singular driver.

43.     Accordingly, "team driver" applicants are desirable to companies like Schneider.

44.     Team drivers also typically have greater earning potential.[2]

45.     Upon applying to Schneider, Plaintiff and his wife successfully completed interviews, and both passed a Department of Transportation test.

46.     On or about August 6, 2024, Schneider extended conditional job offers to Plaintiff and his wife for the positions to which they applied.  The job offers were conditioned upon Plaintiff and his wife each passing a background check ("consumer report").

47.     While the background checks were pending for Plaintiff and his wife, the two began orientation and were given start dates.

48.     On or about August 26, 2024, Plaintiff and his wife drove from Las Vegas, Nevada to Phoenix, Arizona to attend a paid orientation.

49.     Plaintiff and his wife were set to earn more than $3,500 each during the three-week orientation.

**Defendant Published an Inaccurate Background Check Report to Schneider National Carriers, Inc.**

50.     Schneider contracted with Defendant to conduct background checks, including criminal background checks, on its prospective employees.

51.     On or about August 19, 2024, Schneider ordered a criminal background check on Plaintiff from Defendant.

---

[2] *See*, *Team truck driving jobs: What is team truck driving?*, SCHNEIDERJOBS.COM, https://schneiderjobs.com/truck-driving-jobs/driving-opportunities/team (last visited Sept. 27, 2024).

52. On or about August 28, 2024, in accordance with its standard procedures, Defendant completed its consumer report about Plaintiff and sold the same to Schneider.

53. Within that consumer report, Defendant published inaccurate information about Plaintiff.

54. Specifically, Defendant's consumer report about Plaintiff included *twenty-six* grossly inaccurate and stigmatizing misdemeanor records from Los Angeles County, California, which appeared in the consumer report as follows:

```
Jurisdiction:  CA - LOS ANGELES(Felony / Misdemeanor)
       Comments:
Names Searched:  Kim, Kevin: Adverse(As of: 08/28/2024)
        --- Docket:  8MN01665
          Court:  Superior Court
Confirmation Criteria:  Record matches on the following:
                        Name, DOB
       Charge #:  1
          Class:  Misdemeanor
    Charge Date:  03/29/2018
           Plea:  Plead No Contest
     Dispo Date:  02/25/2020
    Disposition:  Guilty
     Conviction:  VC23152(F) : DRIVING UNDER INFLUENCE OF ALCOHOL AND DRUG
  Sentence Date:  02/25/2020
       Sentence:  Probation Type: 36 MONTHS SUMMARY PROBATION
```

/ /

8

```
--- Docket: 2CJ01057
              Court: Superior Court
Confirmation Criteria: Record matches on the following:
                       Name, DOB
           Charge #: 1
              Class: Misdemeanor
       Charge Date: 03/28/2022
             Charge: LA12.21(a)(1)(A) : UNAPPROVED USE OF LAND OUTSIDE OF DESIGNATED ZONNING
               Plea: No Plea
        Disposition: Prosecution Pending
           Sentence: Sentencing Detail: CRIMINAL JUSTICE COURTHOUSE

                      NEXT SCHEDULED EVENT ON 09/19/2024 FOR ARRAIGNMENT AND PLEA.


           Charge #: 2
              Class: Misdemeanor
       Charge Date: 03/28/2022
             Charge: LA91.8105 : BUILDING WITHOUT AUTHORIZED DEMOLISH
               Plea: No Plea
        Disposition: Prosecution Pending
           Sentence: Sentencing Detail: REFER TO COUNT 1


           Charge #: 3
              Class: Misdemeanor
       Charge Date: 03/28/2022
             Charge: LA91.106.1 : UNLAWFUL ALTER INTERIOR BUILDING
               Plea: No Plea
        Disposition: Prosecution Pending
           Sentence: Sentencing Detail: REFER TO COUNT 1


           Charge #: 4
              Class: Misdemeanor
       Charge Date: 03/28/2022
             Charge: LA12.26(E) : OCCUPY LAND WITHOUT CERTIFICATION OF OCCUPANY
               Plea: No Plea
        Disposition: Prosecution Pending
           Sentence: Sentencing Detail: REFER TO COUNT 1
```

//



//

9

Court: Superior Court
Confirmation Criteria: Record matches on the following:
                              Name, DOB
              Charge #: 1
                 Class: Misdemeanor
          Charge Date: 03/28/2022
                Charge: LA57.110.4 : ABATEMENT
                  Plea: No Plea
           Disposition: Prosecution Pending
              Sentence: Sentencing Detail: CRIMINAL JUSTICE COURTHOUSE

                         NEXT SCHEDULED EVENT ON 09/19/2024 FOR ARRAIGNMENT AND PLEA.

              Charge #: 2
                 Class: Misdemeanor
          Charge Date: 03/28/2022
                Charge: LA57.1030.3.2 : OBSTRUCTIONS TO FIRE ASSEMBLY
                  Plea: No Plea
           Disposition: Prosecution Pending
              Sentence: Sentencing Detail: REFER TO COUNT 1

              Charge #: 3
                 Class: Misdemeanor
          Charge Date: 03/28/2022
                Charge: LA57.102.3 : UNLAWFUL CHANGE THE USE AND OCCUPANCY CERTIFICATE
                  Plea: No Plea
           Disposition: Prosecution Pending
              Sentence: Sentencing Detail: REFER TO COUNT 1

              Charge #: 4
                 Class: Misdemeanor
          Charge Date: 03/28/2022
                Charge: LA57.311.3 : OWNER FAIL TO REVOMVE COMBUSTIBLE MATERIALS
                  Plea: No Plea
           Disposition: Prosecution Pending
              Sentence: Sentencing Detail: REFER TO COUNT 1

              Charge #: 5
                 Class: Misdemeanor
          Charge Date: 03/28/2022
                Charge: LA57.315.3.12.2 : UNLAWFULLY STORE COMBUSTIBLE MATERIALS
                  Plea: No Plea
           Disposition: Prosecution Pending
              Sentence: Sentencing Detail: REFER TO COUNT 1

              Charge #: 6
                 Class: Misdemeanor
          Charge Date: 03/28/2022
                Charge: LA57.315.3.3 : STORE COMBUSTIBLE MATERIAL IN BOILER EQUIPMENT ROOMS
                  Plea: No Plea

Charge #: 7
    Class: Misdemeanor
Charge Date: 03/28/2022
    Charge: LA57.605.1 : ABATEMENT OF ELECTRICAL HAZARD
    Plea: No Plea
Disposition: Prosecution Pending
    Sentence: Sentencing Detail: REFER TO COUNT 1

Charge #: 8
    Class: Misdemeanor
Charge Date: 03/28/2022
    Charge: LA57.605.3 : Failure To Have Working Space
    Plea: No Plea
Disposition: Prosecution Pending
    Sentence: Sentencing Detail: REFER TO COUNT 1

Charge #: 9
    Class: Misdemeanor
Charge Date: 03/28/2022
    Charge: LA57.605.6 : Unlawfully Maintain Open Junction
    Plea: No Plea
Disposition: Prosecution Pending
    Sentence: Sentencing Detail: REFER TO COUNT 1

Charge #: 10
    Class: Misdemeanor
Charge Date: 03/28/2022
    Charge: LA57.1024.2.6.1 : Emergency Exit no Exit Symbol
    Plea: No Plea
Disposition: Prosecution Pending
    Sentence: Sentencing Detail: REFER TO COUNT 1

Charge #: 11
    Class: Misdemeanor
Charge Date: 03/28/2022
    Charge: LA57.1030.3.2 : Obstructions to Fire Assembly
    Plea: No Plea
Disposition: Prosecution Pending
    Sentence: Sentencing Detail: REFER TO COUNT 1

Charge #: 12
    Class: Misdemeanor
Charge Date: 03/28/2022
    Charge: LA57.1001.2 : Altered Building Less Than Required by Fire Code
    Plea: No Plea
Disposition: Prosecution Pending
    Sentence: Sentencing Detail: REFER TO COUNT 1

11

Charge #: 13
        Class: Misdemeanor
Charge Date: 03/28/2022
       Charge: LA57.605.3 : Failure To Have Working Space
         Plea: No Plea
  Disposition: Prosecution Pending
     Sentence: Sentencing Detail: REFER TO COUNT 1


Charge #: 14
        Class: Misdemeanor
Charge Date: 03/28/2022
       Charge: LA57.704.2 : Fail To Maintain Opening Prote
         Plea: No Plea
  Disposition: Prosecution Pending
     Sentence: Sentencing Detail: REFER TO COUNT 1


Charge #: 15
        Class: Misdemeanor
Charge Date: 03/28/2022
       Charge: LA57.1020.1 : Unlawful Use of an Exit
         Plea: No Plea
  Disposition: Prosecution Pending
     Sentence: Sentencing Detail: REFER TO COUNT 1


Charge #: 16
        Class: Misdemeanor
Charge Date: 03/28/2022
       Charge: LA57.906.2.3 : Portable Fire Extinguishers In
         Plea: No Plea
  Disposition: Prosecution Pending
     Sentence: Sentencing Detail: REFER TO COUNT 1


Charge #: 17
        Class: Misdemeanor
Charge Date: 03/28/2022
       Charge: LA57.907.2 : Fail to Install/Maintain Approved Fire Alarm Systems
         Plea: No Plea
  Disposition: Prosecution Pending
     Sentence: Sentencing Detail: REFER TO COUNT 1


Charge #: 18
        Class: Misdemeanor
Charge Date: 03/28/2022
       Charge: LA57.901.6 : Failure to Provide Fire Protection Systems
         Plea: No Plea
  Disposition: Prosecution Pending
     Sentence: Sentencing Detail: REFER TO COUNT 1

Charge #: 19
    Class: Misdemeanor
Charge Date: 03/28/2022
    Charge: LA57.105.1.4 : Acting Without A Permit Prohibited
    Plea: No Plea
Disposition: Prosecution Pending
Sentence: Sentencing Detail: REFER TO COUNT 1

Charge #: 20
    Class: Misdemeanor
Charge Date: 03/28/2022
    Charge: LA57.109.1 : Construct or Alter Building in Violation of Code
    Plea: No Plea
Disposition: Prosecution Pending
Sentence: Sentencing Detail: REFER TO COUNT 1

Charge #: 21
    Class: Misdemeanor
Charge Date: 03/28/2022
    Charge: LA57.109.3.2 : Fail to Comply With Notice of Violation Issued
    Plea: No Plea
Disposition: Prosecution Pending
Sentence: Sentencing Detail: REFER TO COUNT 1

55. The criminal charges reported by Defendant about Plaintiff to Schneider *do not* belong to Plaintiff.

56. A cursory review of the widely available public court records confirms that the records belong to an unrelated male, Kevin Kim ("Convicted Misdemeanant Kim").

57. Had Defendant actually consulted or obtained the widely available public court records regarding the *twenty-six* charges, it would have seen obvious discrepancies between Convicted Misdemeanant Kim and Plaintiff.

58. The discrepancies that should have caused Defendant to realize Plaintiff is not the same person as Convicted Misdemeanant Kim include the following:

(a) Plaintiff's date of birth, which was provided to Defendant prior to publishing the subject consumer report, is different than that of Convicted Misdemeanant Kim's date of birth;

13

(b)    Plaintiff's Social Security number, which was provided to Defendant, and is contained on the face of the subject consumer report, is entirely different than that of Convicted Misdemeanant Kim; and

(c)    Plaintiff and Convicted Misdemeanant Kim have two entirely different driver's license numbers.

59.    The sole reason the inaccurate criminal records were reported as belonging to Plaintiff was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the consumer report it sold about Plaintiff to Plaintiff's prospective employer.

60.    Had Defendant followed reasonable procedures, it would have discovered that the inaccurate, stigmatizing criminal records belong to an unrelated individual with a different date of birth, driver's license number, and a different Social Security number from Plaintiff.

61.    In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Plaintiff's prospective employer inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

### Schneider National Carriers, Inc. Withdraws Plaintiff's Job Offer

62.    On or about August 28, 2024, Plaintiff was notified by Schneider that his offer of employment was being withdrawn as a direct result of various criminal records reported by Defendant, including a 2018 DUI.

63.    Plaintiff was shocked and dismayed; he immediately thought that maybe someone had stolen his identity and was committing crimes using his personal information.

64.    Plaintiff also feared that he may be wrongfully arrested for crimes he did not commit.

65.    Plaintiff informed Schneider that the records were not his but was told that he would need to resolve the issue with Driver iQ.

14

66. As Plaintiff was terminated after only two and a half days of orientation, Plaintiff was deprived of over $3,000 of potential income for the orientation period alone.

67. On or about August 29, 2024, shocked and confused about the supposed criminal records on his report, Plaintiff purchased an FBI background report, visited the police department, and requested his DMV and criminal records from other entities as well.

68. Plaintiff also wanted to make sure that his identity had not been stolen. Accordingly, he also reviewed his credit reports.

69. In total, Plaintiff spent approximately $150 and 4-5 hours to confirm he was not associated with the inaccurate records published by Defendant.

70. On or about August 29, 2024, Plaintiff contacted Schneider by email and informed them that he is not Convicted Misdemeanant Kim. Plaintiff explained that the criminal records of Convicted Misdemeanant Kim do not belong to him.

71. The following day, on or about August 30, 2024, Plaintiff contacted Schneider telephonically and once again informed them that he is not Convicted Misdemeanant Kim. Plaintiff explained that the criminal records of Convicted Misdemeanant Kim do not belong to him.

72. Plaintiff also requested that Schneider provide him with a copy of his consumer report; Plaintiff wanted to see exactly what Driver iQ was reporting about him. However, Schneider informed Plaintiff that he would need to request his report from Driver iQ directly.

73. On or about September 6, 2024, Plaintiff finally obtained a copy of the subject consumer report and was truly shocked by the sheer number of inaccurate criminal records that were published in the consumer report Defendant sold about Plaintiff to Schneider.

74. Plaintiff was very panicked, confused, and concerned about the impact of Convicted Misdemeanant Kim's criminal records reported on the subject consumer report – specifically, the impact of the same on his future.

75. Plaintiff is very worried that if he applies to any other trucking companies, that Driver iQ will report the same inaccurate information and cause him additional harm as Driver iQ is used by many companies in the industry.

15

76. Therefore, Plaintiff decided to refrain from submitted further applications until the issue was resolved.

77. Specifically, Defendant matched Plaintiff and Convicted Misdemeanant Kim and published the criminal records of Convicted Misdemeanant Kim onto the consumer report about Plaintiff and sold that report to Plaintiff's prospective employer. The exculpatory public record information was widely available to Defendant prior to publishing Plaintiff's consumer report to Schneider, but Defendant failed to perform even a cursory review of such information.

78. Defendant's false report cost Plaintiff a promising, well-paying job with Schneider.

79. Plaintiff had obtained a Commercial Driver's License specifically so that he could work in the trucking industry with his wife; Plaintiff very much desired being on a team truck driver.

80. Moreover, the position with Schneider was full-time, and Plaintiff was set to earn $10.00 per hour for non-driving assignments and $0.36 a mile for driving assignments. More importantly, Plaintiff was excited to work as a team truck driver because he was qualified to successfully perform the work, and he would be able to work with his wife.

81. Due to Defendant's unreasonable procedures, Plaintiff has remained unemployed.

82. The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

83. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunity(ies), wages, and benefits; loss of economic opportunity(ies) and positions and advancements in the future; damage to his reputation; wasted time and money; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

16

84.    Specifically, Defendant's inaccurate reporting has been embarrassing and humiliating for Plaintiff.

85.    Plaintiff also feels as though he has let down his wife. The inaccurate reporting has also caused tension between the two due to the financial insecurity they are facing.

86.    Defendant's inaccurate reporting has caused Plaintiff to fear that he will be unable to pay his bills, including his mortgage, and potentially end up losing his home.

87.    Due to the inaccurate reporting, Plaintiff has been forced to borrow money from friends in order to pay his bills and get by.

88.    The inaccurate reporting is constantly on Plaintiff's mind, causing him to be distracted and suffer from sleepless nights. Plaintiff feels hopeless and wonders if he will ever be able to recover from the lost employment opportunity and ensure his report is corrected.

## CLAIMS FOR RELIEF

### COUNT I

### 15 U.S.C. § 1681e(b)

**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

89.    Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

90.    Defendant is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

91.    At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

92.    At all times pertinent hereto, the above-mentioned consumer report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

93.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the consumer report it sold about Plaintiff as well as the information it published within the same.

94.    As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunity(ies), wages, and

benefits; loss of economic opportunity(ies) and positions and advancements in the future; damage to his reputation; wasted time and money; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

95.    Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

96.    Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendant negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

/ /

18

Dated: October 1, 2024.

**CONSUMER ATTORNEYS PLC**

By: */s/ Michael Yancey*
Michael Yancey III, NV Bar No. 16158
2300 West Sahara Avenue, Suite 800
Las Vegas, Nevada 89102
Phone: (480) 573-9272
Fax: (718) 715-1750
Email: myancey@consumerattorneys.com

**Consumer Attorneys PLC**
8095 North 85th Way
Scottsdale, Arizona 85258

*Attorneys for Plaintiff Kevin Kim*

19